UNITED STATES of America, Appellee,

v.

Vito M. PASTORE, Appellant.

No. 858, Docket 75–1428.

United States Court of Appeals,
Second Circuit.

Argued March 22, 1976.
Decided June 21, 1976.

Norman A. Palmiere, Rochester, N. Y. (Palmiere, Passero & Crimi, Rochester, N. Y., on the brief), for appellant.

George H. Lowe, Asst. U. S. Atty., Syracuse, N. Y. (James M. Sullivan, Jr., U. S. Atty., N. D. N. Y., Syracuse, N. Y., on the brief), for appellee.

Before LUMBARD, FEINBERG and TIMBERS, Circuit Judges.

FEINBERG, Circuit Judge:

Vito M. Pastore appeals from a judgment of conviction, after a trial before a jury and Judge Lloyd F. MacMahon[1] in the United States District Court for the Northern District of New York, of wilfully and knowingly filing a false income tax return. 26 U.S.C. § 7206(1). Appellant offers a number of reasons why his conviction should be set aside and also argues that one of the conditions of his sentence was improper. We reject the attack on the conviction but find merit in the complaint regarding the sentence.

## I

Since appellant does not argue that the evidence was insufficient, our statement of facts may be brief. From the evidence before it, the jury could properly have found the following facts. Pastore, an attorney, represented the Town of Fleming, New York, in 1970–71, in connection with the installation of a sewer system. Appellant contacted Frank Cedrone, a pipeline contractor, to interest him in the job, telling him that the low bid initially received was about $2 million and inquiring whether the job could be done for under $1½ million. Cedrone in turn brought in Kenneth Marshall, a land developer, who ultimately placed a successful bid of between $1.4 and $1.5 million. Shortly thereafter, the name of Marshall's business was changed to Ron-Ore Soil Systems, and the business was later incorporated under the name of Ron-Ore Soil Systems, Ltd. ("Ron-Ore"). At first, Cedrone was project manager for

---

1. Of the United States District Court for the Southern District of New York, sitting by designation.

Ron-Ore on the Fleming sewer project; later, he became president of Ron-Ore. The first three letters of the corporate name represented Cedrone; the last three, Pastore. Apparently, Ron-Ore was used as a conduit for payments to Pastore from the sewer project.

The Government's theory was that in 1971 the proceeds of a number of checks, drawn upon Ron-Ore or purchased by it,[2] went to appellant. Seven of the checks were payable to "Nick Galloni" or to cash, and were endorsed "Nick Galloni." At trial, Galoni, a Ron-Ore employee whose name is properly spelled with only one "l," denied endorsing the checks or receiving the proceeds. Of the remaining checks, all but one were payable to apparently fictitious payees, and the last was payable to a person who testified that he had no knowledge of the check.[3] Many of these checks were signed for Ron-Ore in the name of George Sedrick, who was a fictitious person. The evidence also showed that a check for $4,062, drawn upon the Ron-Ore account, was used by appellant to pay for a Cadillac in 1971. The Government contended that all of these sums represented payment to appellant for services to Ron-Ore and should have been, but were not, included in appellant's income tax return for 1971. By its verdict, the jury accepted the Government's theory.

The judge sentenced appellant, under 18 U.S.C. § 3651, to two years' imprisonment, six months of which were to be served in a jail-type institution. The judge suspended execution of the remaining 18 months of the sentence and placed Pastore on probation for that period with the special condition that he "resign from the Bar." On appeal, Pastore attacks this special condition of the sentence.

## II

■ We consider first the various arguments addressed to the judgment of convic-

tion. The most troublesome of these concerns the Government's use of handwriting exemplars by Cedrone and Galoni, who were prosecution witnesses.[4] During the trial, at the request of the prosecution and outside the presence of the court, the jury and defense counsel, Cedrone and Galoni provided various specimens of their handwriting for examination by the Government's expert. Nick Galoni wrote his name ten times spelled correctly with one "l" and another ten times with two "l's," as it appeared on the crucial checks. Cedrone provided 12 specimens of handwriting, six in his own name, two in the name of "Irv Furletti," two in the name of Galoni with one "l", and two with two "l's." The expert testified that he had compared Galoni's and Cedrone's exemplars with the handwritten endorsements "Nick Galloni" on the reverse side of four of the disputed checks; Cedrone's exemplars were also compared with the endorsement on a check payable to "Irv Furletti." Based upon his examination, the expert gave his opinion that the exemplars and the check endorsements were not made by the same person. This testimony, to which objection was made, helped to negate an inference that either Galoni or Cedrone had endorsed the checks and kept the proceeds themselves, as defense counsel argued to the jury.

Appellant argues that use of the exemplars was improper under *United States v. Lam Muk Chiu*, 522 F.2d 330 (2d Cir. 1975). In that case, the Government had introduced into evidence ten letters addressed to a confidential informant and bearing a signature in the name of defendant. On the theory that the letters were authenticated by content, they were received without any direct proof of authentication by the testimony of a handwriting expert. As part of his defense at trial, Lam Muk Chiu proffered three samples of his handwriting, which he had prepared after his arraign-

---

**2.** Two of the checks were bank treasurer's checks purchased with Ron-Ore funds.

**3.** This was Irv Furletti, employed by Ron-Ore as a construction worker.

**4.** Both cooperated with the Government and testified pursuant to immunity grants.

ment at the direction of his attorney for use at trial. Defendant intended to show that his handwriting was not the same as the handwriting in the ten letters relied on by the Government. The district court found these handwriting samples "objectionable as self-serving exemplars prepared specially for trial," 522 F.2d at 331, and excluded them. We affirmed, noting that:

> Unquestionably, a defendant has a strong motive to alter his writing so as to render it dissimilar to an incriminating document alleged by the prosecution to be in his hand. Accordingly, any handwriting sample prepared for the specific purpose of showing dissimilarity of handwriting is inherently suspect and should not be admitted into evidence.

Id. at 332.

Despite this strong and broad language, we do not believe that our prior decision requires reversal here. *Lam Muk Chiu* did not adopt a rigid rule excluding all exemplars prepared to show the dissimilarity of the writer's own handwriting to that in another document. The decision there affirmed the ruling of a trial judge in excluding such exemplars. Such a holding does not foreclose a trial judge's discretion to admit similar exemplars into evidence, if the judge believes there are sufficient indicia of reliability. Indeed, the opinion in *Lam Muk Chiu* emphasized such indicia in distinguishing a case relied on by appellant there. Id. at 332. See III Wigmore, Evidence § 697 (Chadbourn rev. 1970) ("the matter should be left to the trial court's discretion"). It is also significant that Lam Muk Chiu was a defendant with a powerful reason to distort the specimens of his handwriting and cast doubt on damaging evidence against him. In contrast, Cedrone

and Galoni were witnesses and not on trial themselves. It is true that at least Cedrone—and possibly Galoni—had a motive to falsify [5] but, arguably, not as strong as a defendant's. Furthermore, defense counsel cross-examined Galoni concerning the circumstances in which he had made the exemplars, and had an opportunity to do the same with Cedrone. In conclusion, while it might be better practice to have such sample signatures prepared under the supervision of the court, cf. *United States v. Wolfish*, 525 F.2d 457 (2d Cir. 1975), we are not prepared to say that the absence of such a precaution requires reversal under the circumstances here.

■■ The remaining attacks on the conviction require less discussion. Appellant argues that the district judge erred in allowing Cedrone to testify that Pastore received Ron-Ore checks, and that the "Ron" of Ron-Ore identified Cedrone and the "Ore" identified Pastore. The latter was not objectionable; the basis of Cedrone's knowledge was made quite clear before he left the stand. As to the testimony regarding the checks, Cedrone's direct testimony was sufficiently based on personal knowledge, contrary to appellant's claim. Perhaps Cedrone's testimony may have been unduly general, but defense counsel had ample opportunity in cross-examination to elicit the basis of Cedrone's knowledge. Pastore also contends that the prosecutor's summation unfairly inflamed the jury. While there were a few phrases that should have been omitted,[6] the judge's emphatic direction to the jury to focus on the issue before it corrected the error, if any. Finally, any objection to the judge's supplemental "Allen charge" was waived by failure to raise the issue below.

---

**5.** Cedrone had not yet been sentenced on an indictment charging the filing of a false income tax return, to which he had already pleaded guilty. Moreover, there were other counts outstanding against him and his wife. Also, a two-count indictment against Galoni, who had received unreported income from Ron-Ore, had been dismissed before trial in return for his testimony against Pastore.

**6.** E. g., reference to Cedrone, his brother Lenny and appellant as the "three primary participants in this raid on the Town of Fleming"; description of the Government's case as "a picture of a corrupt representative of the people of the Town of Fleming getting together with the likes of Frank and Lenny Cedrone, and just lining their pockets with all of the money that was available in this project." The judge properly cautioned the jury that the defendant was not on trial for any charge of corruption.

## III

We come now to the most difficult issue before us. As already indicated, the judge sentenced Pastore to two years imprisonment, but placed him on probation for the last 18 months on the condition he resign as a member of the bar. Appellant claims that this condition exceeded the judge's power because 18 U.S.C. § 3651, the general probation statute, does not authorize forfeiture of a professional license and certainly not a forfeiture that will affect appellant beyond the possible period of probation; because 26 U.S.C. § 7206, the statute defendant violated, does not authorize such a sanction; and because New York State has exclusive jurisdiction over admission to, and removal from, the bar. Appellant also argues that the special condition denied him due process by depriving him of his license to practice law without notice or an appropriate hearing. Appellee responds that the condition was within the court's broad discretion and that, in view of section 90(4) of the New York State Judiciary Law,[7] no further notice was necessary.

The legality of conditions of probation has received surprisingly little attention either from appellate courts or from commentators. This may be due to the general unwillingness of appellate courts until recently to entertain challenges to the validity of such conditions, either because of notions of unreviewability or because of perceived procedural obstacles. See Note, Judicial Review of Probation Challenges, 67 Colum.L.Rev. 181, 188–96 (1967). Perhaps the relative paucity of appellate decisions is due to the restraint of trial judges in imposing probation conditions, although there have been a sufficient number of unusual sentences to illustrate the potential dimensions of the problem. E. g., trial judges have conditioned probation, at one extreme, on sterilization[8] or on banishment from the state for 25 years[9] or for a lesser period[10] and, at the other extreme, on donating blood to the Red Cross,[11] or on writing an essay on "the reasons why the Police Department should be entitled to the respect of the citizenry just as the citizenry is entitled to the respect of the Police Department."[12] In all but one of these instances, which range from the horrendous to the trivial, an appellate court set aside the conditions.[13] However, a sentence of probation has been sustained that prohibited a defendant from belonging to or associating "with Irish Catholic organizations or groups" or visiting "any Irish pubs";[14] and a prohibition on "public speeches designed to . . . encourage others to violate the [income tax] law[s]" has also been ap-

7. That section provides:
> Any person being an attorney and counsellor-at-law, who shall be convicted of a felony, shall, upon such conviction, cease to be an attorney and counsellor-at-law, or to be competent to practice law as such.
> Whenever any attorney and counsellor-at-law shall be convicted of a felony, there may be presented to the appellate division of the supreme court a certified or exemplified copy of the judgment of such conviction, and thereupon the name of the person so convicted shall, by order of the court, be struck from the roll of attorneys.

8. *Matter of Hernandez*, No. 76757 (Cal.Super. Ct., Santa Barbara County, June 8, 1966) (narcotics violation by defendant living with man to whom she was not married and receiving welfare payment for their illegitimate child); *People v. Blankenship*, 16 Cal.App.2d 606, 61 P.2d 352 (Dist.Ct.App.1936) (statutory rape by defendant with syphilis).

9. *Loving v. Commonwealth*, 206 Va. 924, 147 S.E.2d 78 (1966), rev'd on other grounds, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (miscegenation).

10. *State v. Doughtie*, 237 N.C. 368, 371, 74 S.E.2d 922, 924 (1953) (assault with deadly weapon); *People v. Baum*, 251 Mich. 187, 189, 231 N.W. 95, 96 (1930) (liquor law violation).

11. *Springer v. United States*, 148 F.2d 411, 415–16 (9th Cir. 1945) (Selective Service Act violation).

12. *Butler v. District of Columbia*, 120 U.S.App. D.C. 317, 346 F.2d 798 (1965) (false reports of police brutality).

13. The exception is *People v. Blankenship*, supra note 8 (sterilization).

14. *Malone v. United States*, 502 F.2d 554 (9th Cir. 1974), cert. denied, 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975) (gun running to Irish Republic).

proved.[15] More analogous to the sentence here, there are a number of appellate decisions refusing to set aside a sentence that required the defendant to give up his profession or business for the period of his probation. E. g., *Whaley v. United States*, 324 F.2d 356, 359 (9th Cir. 1963) (defendant, who impersonated FBI agent, prohibited from going back into repossession business); *People v. Frank*, 94 Cal.App.2d 740, 211 P.2d 350 (1949) (doctor, who committed lewd act on ten-year old patient, required to abstain from practice of medicine); *Stone v. United States*, 153 F.2d 331, 332–33 (9th Cir. 1946) (railroad stewards, who defrauded employer, prohibited from returning to that employment).[16]

The propriety of conditions on probation raises difficult issues because the relevant standards, as with sentencing generally, are either vague or non-existent. See, M. Frankel, Criminal Sentences, Law Without Order 3–11. The sentence in this case was imposed under 18 U.S.C. § 3651, which provides in part that upon entering a judgment of conviction, the court

when satisfied that *the ends of justice and the best interest of the public as well as the defendant will be served thereby*, may impose a sentence in excess of six months and provide that the defendant be confined in a jail-type institution or a treatment institution for a period not exceeding six months and that the execution of the remainder of the sentence be suspended and the defendant placed on probation *for such period and upon such terms and conditions as the court deems best.* . . .

While on probation and among the conditions thereof, the defendant—

May be required to pay a fine in one or several sums; and

May be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had; and

May be required to provide for the support of any persons, for whose support he is legally responsible.

The court may require a person as conditions of probation to reside in or participate in the program of a residential community treatment center, or both, for all or part of the period of probation . . . .

The court may require a person who is an addict within the meaning of section 4251(a) of this title, or a drug dependent person within the meaning of section 2(q) of the Public Health Service Act, as amended (42 U.S.C. § 201), as a condition of probation, to participate in the community supervision programs authorized by section 4255 of this title for all or part of the period of probation . . . . [Emphasis added.]

It would be hard to use more general words than "upon such terms and conditions as the court deems best." And neither the legislative history of section 3651 nor decisions of the courts of appeals offer much more precise a standard. The Ninth Circuit has stated:

[J]udicial discretion in probation matters is limited only by the requirement that the terms and conditions thereof bear "a reasonable relationship to the treatment of the accused and the protection of the public."

*United States v. Nu-Triumph, Inc.*, 500 F.2d 594, 596 (1974). Similarly, in *Porth v. Templar*, supra at note 15, the Tenth Circuit stated:

The sentencing judge has a broad power to impose conditions designed to serve the accused and the community. The only limitation is that the conditions have a reasonable relationship to the treatment of the accused and the protection of the public. The object, of course, is to pro-

15. *Porth v. Templar*, 453 F.2d 330, 334 (10th Cir. 1971) (failure to file tax returns).

16. See also *United States v. Greenhaus*, 85 F.2d 116, 117 (2d Cir.), cert. denied, 299 U.S. 596, 57 S.Ct. 192, 81 L.Ed. 439 (1936) (court noted, but did not consider, probation condition that defendant who had been convicted of illegal sale of securities "not engage in . . . any stock or bond sale").

duce a law abiding citizen and at the same time to protect the public against continued criminal or antisocial behavior. 453 F.2d at 333. In the District of Columbia Circuit, the sentencing court's authority has also been described in expansive but vague terms:

> The power to impose conditions is a broad one, governed by the standard of reasonableness, which permits insulating the individual from the conditions that led him into trouble.

*United States v. Moore,* 158 U.S.App.D.C. 375, 486 F.2d 1139, 1174, cert. denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973) (en banc) (Leventhal, *J.,* concurring). Finally, the Eighth Circuit has emphasized the broad discretion of the sentencing court:

> Probation of a convicted defendant is a matter of grace and not a matter of right. . . . The granting of probation, and the conditions upon which it is granted as well as its revocation are matters purely within the discretion of the trial court and are reviewable only upon abuse of discretion.

*United States v. Alarik,* 439 F.2d 1349, 1351 (1971).

In addition to noting the absence of definitive guidelines in the statute or in appellate decisions, a number of general observations are appropriate. Had the judge rejected probation and simply sent Pastore to jail for the full two years of his sentence instead of only for six months, there could ordinarily have been no meaningful claim that Pastore had been improperly denied

the right to practice law for that period. Imprisonment obviously takes away the means of livelihood, while providing minimum sustenance. Why, then, should the lesser penalty be objectionable if the greater is not?[17] The answer must be that the judge was exercising his discretion, and that this must be done lawfully whatever the penalty. Of course, the term "lawful" begs the question; sentencing discretion is broad indeed and frequently unreviewable. Nevertheless, the recent trend has been at least to focus upon the process to reduce the chance of injustice from isolated eccentricity.[18]

■ Moreover, it is of some significance that 18 U.S.C. § 3651 lists various special conditions of probation. In addition to a fine, these are: restitution or reparation to aggrieved parties, provision for support of a person for whom a defendant is legally responsible, participation in a residential community treatment center, and participation in a community program for drug addicts. We do not suggest that specification of four conditions of probation negates other possibilities. But it supports our belief that, without entering the battle over whether there should be general appellate review of sentencing, careful scrutiny of an unusual and severe probation condition is appropriate. In engaging in such review, we accept the broad standard of the cases cited above that judicial discretion on conditions of probation is limited by the requirement that they bear "a reasonable relationship to the treatment of the accused and the protection of the public." Such a

---

17. We put aside for the moment any argument that disbarment here may be for life and was therefore not a lesser penalty than imprisonment for two years.

18. E.g., *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974) (requiring sentencing court to make an explicit finding on the record that youthful offender would not benefit from treatment under the Federal Youth Corrections Act, 18 U.S.C. § 5005 et seq.); *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) (approving remand of case to trial court for reconsideration of sentence when there is a possibility that sentencing court had relied on

two unconstitutional convictions in meting out sentence); *United States v. Manuella,* 478 F.2d 440 (2d Cir. 1973) (improper for court to sentence defendant immediately after conviction subject to revision after presentence report is obtained); *United States v. Brown,* 470 F.2d 285 (2d Cir. 1972) (when sentencing judge refused to disclose presentence report as an unvaried rule, remand with instructions to exercise discretion in each case); *McGee v. United States,* 462 F.2d 243 (2d Cir. 1972) (vacation and remand for resentencing when sentence is not revised after major count of conviction is dismissed).

broad rule has the advantage of allowing case-by-case development of the contours of doctrine.

■ Finally, there is a serious issue whether a federal district judge, unguided by Congress except in the most general terms, can require a defendant to give up a lawful livelihood. Examples that illustrate the problem spring to mind. In sentencing defendants convicted of a tax offense: Could a district judge require a doctor to relinquish his license to practice medicine? Could a judge force a teacher to resign from the public school system or from a private school or to give up private tutoring? What about a bricklayer? Could he be required to resign as an officer of his union? These are perhaps unlikely examples because the connection between the crime and any "treatment of the accused" or "protection of the public" is weak. But suppose the doctor has been convicted of selling narcotics or the teacher of assaulting a child? The impulse to ban the defendant from continuing in the same job is strong, and perhaps the power of a district judge to do so should be obvious. On the other hand, imprisonment, monetary impositions and community treatment programs are potent and, possibly, sufficient sanctions for a sentencing judge. Perhaps the suitability of a defendant for continuing in a particular job should not be determined in the sentencing process unless the legislature specifically authorizes it, but should be resolved in other ways and in other forums and guided, when possible, by the legislature.[19] In any event, before any defendant is required to give up his job, or trade or profession, he should be given a meaningful opportunity to demonstrate why such a condition might be inappropriate. If there is already in existence a well-defined procedure for resolution of that issue, it makes sense to utilize it.

■ With these general considerations in mind, we turn to the precise condition imposed upon Pastore—forced resignation from the bar. The judge undoubtedly believed that Pastore's conviction conclusively demonstrated that he lacked the good character statutorily required for admission to the bar,[20] and presumably necessary for continued membership. However, appellant argues that this is not necessarily so since under the applicable state statute[21] and Appellate Division Rules,[22] disbarment for this offense would not be automatic,

19. Cf., e. g., N.Y. Educ.L. §§ 3012, 3013, 3020, 3020–a (McKinney 1970); see 29 U.S.C. § 1111.

20. N.Y. Judiciary Law § 90(1)a provides:

Upon the state board of law examiners certifying that a person has passed the required examination, or that the examination has been dispensed with, the appellate division of the supreme court in the department to which such person shall have been certified by the state board of law examiners, if it shall be satisfied that such person possesses the character and general fitness requisite for an attorney and counsellor-at-law, shall admit him to practice as such attorney and counsellor-at-law in all the courts of this state, provided that he has in all respects complied with the rules of the court of appeals and the rules of the appellate division relating to the admission of attorneys.

21. N.Y. Judiciary Law § 90(4), quoted at note 7 supra.

22. Rules Relating to Attorneys, N.Y. App.Div., 4th Dep't, § 1022.21, provides in pertinent part:

(a) Upon the filing with the Appellate Division of a certificate of the conviction of an attorney of a serious crime as defined in paragraph (b) in a court of record in this State or any other State, territory or district, the court shall immediately refer the matter to a referee, justice or judge for disciplinary hearings, whether the conviction resulted from a plea or a verdict after trial and regardless of the pendency of an appeal. If the crime is not a serious crime as defined in paragraph (b), the court may refer the matter to the chief attorney for appropriate disciplinary action or to a referee, justice or judge as above provided.

(b) For purposes of this section, the term "serious crime" includes any felony not resulting in automatic disbarment under section 90(4) of the Judiciary Law, and any lesser crime a necessary element of which by statutory or common law definition involves interference with the administration of justice, criminal contempt of court, false swearing, misrepresentation, fraud, failure to file income tax returns, deceit, bribery, extortion, misappropriation, theft; or an attempt, conspiracy or solicitation of another to commit such a crime.

and he would have an opportunity to demonstrate why he should not be disbarred.[23] We express no view on the Government's contention that disbarment in the state forum would be inevitable; our concern is that a controversy does exist, and the sentencing procedure followed here decided the issue against appellant without notice or argument. The connection between Pastore's income tax violation and the protection of the public in requiring his resignation from the bar depends upon the resolution of that issue.

There is, no doubt, a general public feeling that one who has been convicted of a crime should not practice law, and this proposition is surely true in many cases. But the applicable law cited above recognizes that there are exceptions and that the facts of the individual case should control. Since expulsion from the state bar is a sanction precisely governed by statute and regulation, it would seem preferable not to impose that sanction except by the procedure and for the reasons there prescribed. The protection of the public that was the judge's legitimate concern here could have been safeguarded by sending the judgment of conviction to the Appellate Division of the State of New York for appropriate proceedings. While these proceedings have sometimes been unduly dilatory in the past and are subject to other telling criticism, as the concurring opinion of Judge Lumbard illustrates,[24] the remedy is to speed up and improve such proceedings, not to bypass them. Moreover, a federal district court may adopt its own rules regarding disbarment or discipline of attorneys convicted of a crime, and the United States District Court for the Northern District has done so.[25] Apparently under that rule, Pastore could have been automatically suspended from practice in that court, which would have achieved a good part of the objective the district judge had in mind here. But under the Northern District rule, Pastore would then have had the right to show "good cause" to the district court why he should not be "further suspended or disbarred from practice" before that court. This would at least have preserved for appellant the procedural rights he was denied here.

We do not condone appellant's conduct. Nor do we believe that sentencing judges should show particular solicitude for lawyers or for others engaged in a profession. The sentence of six months in jail and 18 months on probation was certainly an appropriate exercise of discretion by the trial judge. However, we have before us a severe additional sanction that deprives a defendant of his livelihood (in this case, presumably for well past the 18-month period of probation, if not for life). There is also an issue as to whether protection of the public requires imposition of this extreme sanction, and we have some doubts over the power of a sentencing judge to impose such a condition. Given the availability of alternative and well-defined procedures for expulsion from the bar, which would have accorded appellant procedural rights here denied him, we hold, in the exercise of our supervisory power, that this particular condition of probation was improper. Accordingly, we remand for resentencing.[26]

---

**23.** Appellant cites *Matter of Taylor*, 29 A.D.2d 132, 286 N.Y.S.2d 138 (4th Dep't 1968), for the proposition that under state law his conviction in this case would not be regarded as a felony and therefore would not trigger automatic disbarment.

**24.** Also, cf. Report on the Grievance System, The Association of the Bar of the City of New York 9–19 (1976).

**25.** General Rule 4 of that court provides in pertinent part:
> When it is shown to the Court that any member of its bar has been suspended or disbarred from practice in any court of record, or has been guilty of conduct unbecoming a member of the bar of the Court, the member will be forthwith suspended from practice before the Court, and notice of his suspension will be mailed to him, and unless he shows good cause to the contrary within 40 days, thereafter, he will be further suspended or disbarred from practice before this Court.

**26.** On this disposition of the case, we need not deal with appellant's constitutional and statutory arguments.

LUMBARD, Circuit Judge (concurring):

I concur in the court's opinion but add a few words as to my understanding regarding the power of the district court to act upon the right of the defendant to practice law in the New York state courts.

In my opinion, the most that the district court has the power to do with respect to defendant's practice in the New York courts is to refer to the appropriate Appellate Division of the New York Supreme Court the matter of what disciplinary action should be taken regarding the defendant's right to practice in the New York courts. It is not true and never has been true, as the government contends, that disbarment automatically follows conviction for a federal felony. Pastore's conviction for tax evasion, though a felony under federal law, would only have been a misdemeanor under New York law and would be treated as a misdemeanor by the state courts in any disciplinary proceedings. *E. g., Neville v. Monroe County Bar Assn.,* 31 A.D.2d 266, 297 N.Y.S.2d 271 (4th Dept. 1969), *aff'd* 25 N.Y.2d 782, 303 N.Y.S.2d 529, 250 N.E.2d 586 (Ct.App.1969); *Curtis v. Monroe County Bar Assn.,* 39 A.D.2d 86, 332 N.Y.S.2d 438 (4th Dept. 1972); *Joyce v. New York State Bar Assn.,* 37 A.D.2d 289, 324 N.Y.S.2d 638 (3d Dept. 1971). As is well known, where attorneys have been convicted of tax evasion in violation of federal law the most that has happened is a suspension from practice for periods of time ranging from three months up to one year. In some cases only a censure has been imposed. As for the federal courts, the conviction of an attorney for a federal felony or misdemeanor is seldom, if ever, followed by any disciplinary action regarding federal court practice. The federal courts have no staff to handle such matters and they have relied entirely on the state court authorities to take such action as they think proper.

The grant of the right to practice law is primarily the responsibility of the state. Applicants are subjected to extensive examination and investigation prior to admission to practice in New York and also Connecticut and Vermont. Thereafter practice in a federal district court has been pretty much pro forma. The federal district courts of this circuit have seldom taken the trouble to require any showing of knowledge or experience beyond that which is certified by admission to the bar of one of our three states. Indeed, the great majority of attorneys admitted to the bars of New York, Connecticut and Vermont practice largely in their state courts, with only a small percentage spending any appreciable amount of time on federal court matters.

So far as protection of the public is concerned, I think it is obvious that the courts and the profession have been far too lax in imposing sanctions where there has been substantial basis for doing so. But that is not a matter where the federal courts have any right or duty to lead the way.

In the light of all these circumstances, it is my view that the district court has no power whatever to affect the right of the defendant to practice in the New York courts. It may only refer the matter to the proper New York authorities for the slap on the wrist which may or may not be administered sometime in the future. The haphazard and lenient fashion in which the courts and the profession have imposed sanctions for unprofessional and criminal conduct of attorneys is cause for concern. This failure to supervise effectively where the need has been demonstrated surely presents a strange contrast to current concern about professional training and competence.

Of course, as the majority opinion points out, it would have been entirely proper for Judge MacMahon to act with respect to Pastore's right to practice in the federal courts, but this would have to be done in accordance with the rules of the particular federal court where Pastore was admitted to practice.