817 F.2d 105
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bill LEWIS, Defendant-Appellant.
 No. 86-5103.
 United States Court of Appeals, Sixth Circuit.
 May 4, 1987.
 
 On appeal from the United States District Court for the Western District of Tennessee.
 BEFORE ENGEL, JONES and NELSON, Circuit Judges.
 DAYED A. NELSON, Circuit Judge.
 
 
 1
 This is an appeal from convictions for obstruction of justice in warning an arson suspect that he was being investigated by a federal grand jury and for perjury in subsequently denying before the grand jury that such a warning had been given. The appellant challenges the obstruction of justice conviction on the grounds both that there was no pending grand jury proceeding and that there was insufficient evidence to show he warned the suspect. He challenges the perjury conviction on the grounds that he was charged under the wrong section of the statute, that the charge was not sufficiently specific, and that the allegedly false testimony was not material. Finally, the appellant contends that the district court abused its discretion in requiring him to refrain from holding public office as a condition of probation. Finding none of these contentions well taken, we shall affirm the judgment of the district court in all respects.
 
 
 2
 On November 21, 1983, a federal grand jury that had been empaneled in July of that year indicted one Robert Daniel, of Dyersburg, Tennessee, for conducting an illegal gambling business. The grand jury continued to serve until its discharge in June 1985, but apparently did not discuss Daniel again for more than a year after his indictment. On May 4, 1984, a tavern in which Daniel had an interest was destroyed by fire. Defendant Bill Lewis, a fire marshal for the State of Tennessee, was one of several state and local officials who investigated the fire. On November 27, 1984, Lewis suffered a heart attack; he was absent from his job thereafter. An undercover investigation of a possible intentional setting of the tavern fire was begun at about this time, and the United States Attorney for the Western District of Tennessee was also Alerted to a suspected plot to kill Dyer County's District Attorney General, Jim Horner.
 
 
 3
 In December of 1984 an agent with the Federal Bureau of Alcohol, Tobacco and Firearms (ATF) joined the arson investigation. A fire marshal for the State of Tennessee testified that this ATF agent "initiated an investigation" and assisted with the use of wireless transmitters and "body bug systems." In early December a former Dyersburg policeman, Rodney Davis, was approached with evidence that it was he who had set the fire at the tavern. Davis agreed to cooperate with the undercover investigation, and surreptitiously tape recorded several conversations with Robert Daniel in which Daniel expressed a desire to have one of his stores burned and spoke of contracting for the murder of District Attorney General Horner. Then, on December 19, 1984, Mr. Daniel began talking to Mr. Davis about plans to remodel the store he had previously said he wanted burned; this caused investigators to suspect that Daniel had discovered his conversations were being recorded.
 
 
 4
 On December 20 Robert Frost, a supervisor of state fire marshals, told Defendant Lewis of the use of the tape recordings and said that Daniel and others would probably be indicted. Later that same day investigators approached Robert Call, a former deputy sheriff, with evidence that he assisted in setting the tavern fire. After admitting involvement in the arson and the plot to kill District Attorney General Horner, Call agreed to wear a tape recorder in place of Davis. On December 21, during a taped conversation between Call and Daniel, Daniel said that Defendant Lewis had warned him on December 14 that someone was taping his conversations.
 
 
 5
 The investigation continued until Daniel was arrested on January 7, 1985. Testifying before the grand jury, Defendant Lewis admitted that he had stopped by Daniel's place of business on December 14; he denied that he had warned Daniel of the taping, however, and asserted that he did not know of it until December 20, when Frost called him. Lewis did, however, admit asking Daniel whether he wanted to have the District Attorney General killed.
 
 
 6
 At Lewis' trial for obstruction of justice and perjury, Daniel testified that Lewis had come to his business office sometime in December, on a date he no longer remembered, and warned him of the taping. The jury returned a verdict against Lewis on both counts of the indictment. The court sentenced him to confinement for one year on the obstruction count and probation for two years on the perjury count. A special condition of his probation was that Lewis, who had retired from the Fire Marshal's office and been elected Mayor of Tiptonville, could not hold public office during the term of the probation.
 
 1. Obstruction of Justice
 A. Pendency of a Judicial Proceeding
 
 7
 18 U.S.C. Sec. 1503 (1984) provides, in part, as follows:
 
 
 8
 "Whoever ... corruptly ... influences, obstructs, or impedes, or endeavors to influence, obstruct or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."
 
 
 9
 A prerequisite to a finding of guilt under Sec. 1503 is that a federal judicial proceeding be pending at the time of the alleged violation. United States v. Baker, 494 F.2d 1262, 1265 (6th Cir. 1974). A grand jury investigation is one such judicial proceeding, United States v. Vesich, 724 F.2d 451, 454 (5th Cir. 1984); United States v. Walasek, 527 F.2d 676, 678 (3d Cir. 1975), but Defendant Lewis contends that a grand jury proceeding was not "pending" at the time he allegedly warned Daniel of the taping.
 
 
 10
 The question of when a grand jury proceeding can be said to be "pending" has been addressed by other courts in decisions that illuminate the problem before us. In United States v. Walasek, 527 F.2d at 678, the Court of Appeals for the Third Circuit declined "to articulate any necessary minimum set of circumstances" for a finding of pendency. The court continued as follows:
 
 
 11
 "Appellant would have us adopt a rigid rule that a grand jury proceeding is not 'pending' until a grand jury has actually heard testimony or has in some way taken a role in the decision to issue the subpoena.... [W]e are not inclined to adopt it. Appellant is correct in his observation that a grand jury subpoena may become an instrumentality of an investigative agency, without meaningful judicial supervision. Nevertheless, the remedy against potential abuse is not to establish a rule, easily circumvented, by which some formal act of the grand jury will be required to establish 'pendency.' The remedy is rather to continue to inquire, in each case, whether the subpoena is issued in furtherance of an actual grand jury investigation, i.e., to secure a presently contemplated presentation of evidence before the grand jury."
 
 
 12
 Id. (footnote omitted).
 
 
 13
 In a later Third Circuit case, United States v. Simmons, 591 F.2d 206, 210 (3d Cir. 1979), the court held that "an investigation by a law enforcement agency ripens into a pending grand jury investigation for purposes of SSl503 when officials of such agency apply for, and cause to be issued, subpoenas to testify before a sitting grand jury." The court declined to require that the grand jury be aware of the subpoena or otherwise involved in the investigation. Id.
 
 
 14
 The Court of Appeals for the Fifth Circuit has also declined to adopt a rigid rule for determining whether a grand jury proceeding is pending. In United States v. Vesich, 724 F.2d at 455, the court held that a subpoena need not have been issued for the grand jury proceeding to be considered "pending." There a witness had signed a written agreement to testify before a then-empaneled federal grand jury whenever called, but he was not formally subpoenaed. The court said, "Though these circumstances are perhaps at the outer edge of the required pendency, nevertheless we are of the view that they are not beyond it." Id. at 456.
 
 
 15
 In the present case, a grand jury empaneled in July 1983 was investigating, according to the testimony of the grand jury foreman, gambling and "other corruptions within Dyer County, (involving] the Sheriff and a lot of other people there in Dyer County." By November 21, 1983, numerous witnesses had testified, and Daniel was indicted on that day for conducting an illegal gambling business. The foreman testified as follows:
 
 
 16
 "Q: At the time that the indictment was returned was it your understanding that that was the end of the investigation?
 
 
 17
 A: No, sir, we had a continuous investigation of Dyer County. Like I said, it was a lot of stuff going on over there.
 
 
 18
 Q: What about Mr. Daniel, were you through with Mr. Daniel when you indicted him on the illegal gambling business then?
 
 
 19
 * * *
 
 
 20
 A: As far as the Grand Jury was concerned on Mr. Daniel, yes, sir.
 
 
 21
 Q: Were you pursuing anything else on Mr. Daniel?
 
 
 22
 A: I don't believe so.
 
 
 23
 Q: Let me ask you, you previously indicated there were some arsons, fires being set and that you were looking at Mr. Daniel?
 
 
 24
 A: Oh, yes, sir, this has been such a long time ago that I think Mr. Daniel had got a girl friend or something that had a fire at her trailer, and I believe we were investigating that because it was a false insurance claim.
 
 
 25
 Q: All right, now, so were you expecting any more evidence to be presented before you as far as Mr. Daniel and other areas of your investigation in Dyersburg?
 
 
 26
 A: Yes, sir."
 
 
 27
 Although the grand jury did not hear any more testimony about Daniel for some months, we must view the evidence in the light most favorable to the government, United States v. Elkins, 732 F.2d 1280, 1287 (6th Cir. 1984), and when we do so we can only conclude that a grand jury proceeding was pending. The foreman's testimony indicates that the grand jury was conducting a broad investigation of officials in Dyer County. Although the grand jury could not have known at the time of Daniel's indictment that he would be involved in an act of arson yet to be perpetrated, the grand jury thought there "was a lot of stuff going on over there," and it was not inconceivable that several months of investigation would be required before more evidence on Dyer County could be presented to the grand jury.
 
 B. State of Mind Under Sec. 1503
 
 28
 Absent force or threats, a conviction under Sec. 1503 requires that the obstruction be effected "corruptly." "Corruptly" has been defined as "for an evil or wicked purpose," United States v. Ryan, 455 F.2d 728, 734 (9th Cir. 1972), or "for an improper motive." United States v. Haas, 583 F.2d 216, 220 (5th Cir. 1978), cert. denied, 440 U.S. 981 (1979). Although Defendant Lewis argues that this element of the offense was not proved, we know of no proper motive or purpose that Lewis could have had in warning a suspect that his conversations were being taped.
 
 
 29
 Also without merit is the contention that there was not a federal judicial proceeding but only a state investigation. A federal grand jury was investigating widespread corruption in Dyer County, and a federal law enforcement agency had become involved in the investigation. As the Simmons court observed, in declining to hold that the grand jury must be aware of subpoenas issued,
 
 
 30
 "[s]uch requirement ignores the reality of the manner in which a grand jury operates and the mechanism by which subpoenas are issued. In In re Grand Jury Proceedings, 486 F.2d 85 (3d Cir. 1973), we observed, albeit somewhat critically, that
 
 
 31
 although grand jury subpoenas are occasionally discussed as if they were the instrumentalities of the grand jury, they are in fact almost universally instrumentalities of the United States Attorneys office or of some other investigative or prosecutorial department of the executive branch."
 
 
 32
 United States v. Simmons, 591 F.2d 206, 210 (3d Cir. 1979).
 
 
 33
 As the foreman of the grand jury testified in this case, the grand jury was conducting an ongoing investigation by awaiting the presentation of evidence from investigative and prosecutorial agencies.
 
 
 34
 C. Sufficiency of Evidence that Lewis Warned Daniel
 
 
 35
 We further find that there was sufficient evidence that Defendant Lewis warned Daniel of the investigation. Daniel told Call, in a conversation taped on December 21, that the defendant had warned him one week earlier. Although the defendant argues that he was not informed of the investigation until December 20, it is by no means inconceivable that he learned of it earlier. As State Fire Marshal Pollard testified, an individual named Johnny West was used to tape conversations with Davis as early as November of 1984. That the investigation was not entirely secret is evidenced by the fact that someone unconnected with it informed Sheriff Cribbs of the taping when arrested for drunk driving.
 
 II. Perjury
 
 36
 The defendant also challenges his conviction for perjury, claiming that he was charged under the wrong section of the statute, that the government failed to specify the testimony known to be false, and that the government failed to demonstrate that the allegedly false testimony was material.
 
 A. Section of the Statute
 
 37
 The defendant was charged with perjury under 18 U.S.C. Sec. 1 623(a) (1984), which provides:
 
 
 38
 "Whoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both" (emphasis supplied.)
 
 
 39
 The indictment charged Defendant Lewis with "knowingly [making] materially false declarations." Clearly the defendant was charged under the appropriate section of the statute.
 
 B. Specificity of the Charge
 
 40
 The defendant next claims that the prosecution failed to specify which answers were knowingly false. The indictment quoted approximately nine pages of testimony alleged to be the "materially false declarations." Pursuant to court order, the government filed a Bill of Particulars stating:
 
 
 41
 "[T]he defendant, while under oath, did knowingly declare in part before the Grand Jury those statements set out on pages 4 through 13 which were false in the following regards:
 
 
 42
 a. That the only thing Bill Lewis said to Robert Daniel was, in effect, Have you hired anybody to kill the Attorney General;
 
 
 43
 b. That Bill Lewis did not advise Daniel of the ongoing investigation;
 
 
 44
 c. That Bill Lewis did not advise Daniel that he (Daniel) was being taped and to be careful."
 
 
 45
 The following excerpt from Defendant Lewis' testimony before the grand jury clearly indicates that he denied ever having warned Daniel of the investigation:
 
 
 46
 "Q. Did you tell [Daniel] that he was under investigation for that, at that point?
 
 
 47
 A. No, sir, I did not.
 
 
 48
 Q. Did you tell him that the Federal people, or the Fire Marshals were looking for him?
 
 
 49
 A. No, I did not.
 
 
 50
 Q. Or that somebody was wearing a wire.
 
 
 51
 A. No, did not."
 
 
 52
 The Bill of Particulars makes clear that the testimony claimed to be perjurous is testimony that the defendant did not warn Daniel of the investigation or of the fact that someone was recording his conversations.
 
 C. Materiality
 
 53
 The defendant's third challenge to the perjury conviction is that the testimony alleged to be perjurous was not demonstrated to have been material. The foreman of the grand jury testified, however, that the grand jury was investigating "corruptions within Dyer County, the Sheriff and a lot of other people there in Dyer County." He further stated, "[W]e had heard testimony between Mr. Daniel, and I believe Robert Call, and Mr. Lewis' name came up and we wanted to find out further information about what they were talking about and everything." Clearly evidence that an official with the Fire Marshal's office was obstructing the investigation of matters the grand jury was looking into is material to the grand jury proceeding.
 
 III. Special Condition of Probation
 
 54
 Finally, the defendant claims that the special condition imposed upon his probation is improper. The court required that the defendant not "hold any public office during the probationary period." The defendant had been elected Mayor of Tiptonville for a four-year term to expire in 1989.
 
 
 55
 The trial court has wide discretion in determining the appropriate sentence, including probation. United States v. Anglian, 784 F.2d 765, 768 (6th Cir.), cert. denied, 107 S.Ct. 148 (1986). In United States v. Tolla, 781 F.2d 29, 34 (2d Cir. 1986) (citations omitted) (emphasis by court), the court stated,
 
 
 56
 "No condition of probation, however, may be presumed valid. Each must be measured on a case by case basis against the reasonable relationship standard .... Under this standard, a contition is related to the goals of probation if it is designed, in light of the crime committed, to promote the probationer's rehabilitation and to insure the protection of the public .... A condition is reasonable if it is not unnecessarily harsh or excessive in achieving these goals .... [C]onditions that restrict a probationer's freedom must be especially fine-tuned."
 
 
 57
 In the present case, requiring the defendant to refrain from holding public office during the term of his probation (two years) would tend to reinforce the idea that one should not use his public office corruptly and then commit perjury to protect himself. The defendant is receiving retirement income, so he will not be deprived of a livelihood. The condition will last only for the duration of the two years of probation. In our view the condition is related to the goals of probation and is not unreasonable.
 
 
 58
 The judgment of the district court is AFFIRMED.
 
 
 59
 JONES, Circuit Judge, concurring in part and dissenting in part.
 
 
 60
 Although I concur in the majority's decision to affirm the judgment entered on Lewis' conviction of perjury, I dissent from the majority's decision to affirm Lewis' conviction for obstruction of justice under 18 U.S.C. Sec. 1503 (1982). I also dissent from the majority's decision to affirm the special condition of probation imposed on Lewis.
 
 A.
 
 61
 Although the recitation of the facts in the majority opinion is accurate, for purposes of clarity, I will briefly highlight some significant facts. The grand jury was empaneled in July 1983. It returned an indictment against Robert Daniel on November 21, 1983. After returning this indictment, the grand jury was advised that the investigation of Dyer County would continue. The fire that destroyed the tavern was set in May 1984. Local officials began investigating the fire shortly thereafter, and federal officials joined in the investigation in December 1984. The target of the investigation was Daniel. Lewis learned of this investigation on December 20. Daniel was arrested on January 7, 1985. The grand jury began to hear testimony about the arson investigation on January 8, 1985. Lewis was subpoenaed by the grand jury and appeared on January 15, 1985. During his testimony Lewis repeatedly denied that he had told Daniel about the arson investigation. It was this testimony that led to Lewis' indictment for perjury. During the one-year plus interval between the time when Daniel was indicted and when the grand jury began hearing testimony regarding the arson investigation, the grand jury heard absolutely no testimony regarding any investigation going on in Dyer County. Although the grand jury did remain empaneled during this period, it was hearing only routine matters.
 
 
 62
 The majority opinion correctly states the law with regard to the necessary elements for a conviction under 18 U.S.C. Sec. 1503. A prerequisite to prosecution under Sec. 1503 is that there be a pending judicial proceeding. See United States v. Johnson, 605 F.2d 729, 730 (4th Cir. 1979), cert. denied, 444 U.S. 1020 (1980); United States v. Baker, 494 F.2d 1262, 1265 (6th Cir. 1974). The key question with regard to Lewis' obstruction of justice conviction is whether a grand jury investigation was pending at the time of his conversations with Daniel. The majority concluded that a grand jury investigation was pending. The majority based this conclusion largely on the testimony of the jury foreman. The foreman stated that the grand jury was conducting a broad investigation of officials in Dyer County and that even after Daniel's indictment, the grand jury was expecting more evidence to be presented with regard to corruption in the county.
 
 
 63
 My review of the record convinces me that a grand jury investigation was not pending at the time when Lewis met with Daniel. It is clear that at some point there was a grand jury investigation of illegal activity in Dyer County. The real question is whether this investigation ended when Daniel was indicted in November of 1983. The grand jury was not dismissed following this indictment. However, it is evident that in the intervening period between the indictment and when the grand jury once again began hearing testimony about Dyer County on January 8, 1985, the grand jury met only five times, and never considered the question of corruption in Dyer County. Indeed, the grand jury foreman confirmed this when he stated that the grand jury heard no testimony regarding Dyer County between November 21, 1983 and January 8, 1985. The government contends that since the investigating agencies had continued their investigation and were actively seeking evidence to present to the federal grand jury, the pending requirement was satisfied. However, the grand jury's participation in this investigation during this 14 month period was nonexistent. Therefore, the investigatory agencies were not acting "in furtherance of an actual grand jury investigation .... " United States v. Walasek, 527 F.2d 676, 678 (3rd Cir. 1975). Moreover, the events that led to the testimony presented before the grand jury in January 1985, namely the fire at the tavern, occurred in May of 1984, five months after the November indictment.
 
 
 64
 The government argues, in essence, that simply because the grand jury had once been engaged in an investigation of Dyer County, that investigation continued to pend, even though the grand jury had not in any way done anything with regard to that investigation for over one year. At some point that investigation had to have ceased. The fact that the grand jury remained empaneled does not detract from this because during this period the grand jury was involved with other, unrelated matters. The majority's holding is, in essence, that so long as a grand jury that had at one point investigated a particular area remains empaneled and at some point in the future resumes investigating that area, the original investigation remains pending, regardless of how long the investigation has lain dormant, and regardless of whether the grand jury has remained empaneled for other, unrelated purposes. In my view, this is a clear misinterpretation of the law and stretches the definition of pending nearly to the breaking point.
 
 
 65
 The circuit courts that have addressed this issue have suggested that the question of whether a judicial proceeding is pending should be determined on a case by case manner. See, e.g., United States v. Vesich, 724 F.2d 451 (5th Cir. 1984); Walasek, 527 F.2d 676. In this case, the court should conclude that at the time Lewis allegedly violated Sec. 1503, no judicial proceeding was pending. At that time the only investigation taking place was an agency investigation. The instant judicial proceeding was not reinstated until after that date. Therefore, I would reverse Lewis' conviction for violating 18 U.S.C. Sec. 1053.
 
 B.
 
 66
 Lewis was sentenced to two years probation on the perjury conviction. As a special condition of probation, the court ordered that Lewis not hold any public office during the probationary period. Lewis is presently the mayor of Tiptonville, Tennessee. The special condition of probation will require him to give up this office.
 
 
 67
 A trial court is vested with wide discretion in determining an appropriate sentence. United States v. Anglian, 784 F.2d 765, 768 (6th Cir.) (citations omitted), cert. denied, 107 S.Ct. 148 (1986). However, a trial court does not have unlimited discretion. A condition of probation must, for example, bear a reasonable relationship to the treatment of the accused and the protection of the public. United States v. Pastore, 537 F.2d 675, 681 (2nd Cir. 1976). Although the standards for reviewing a condition of probation are not very clear, id. at 680, "careful scrutiny of an unusual and severe probation condition is appropriate." Id. at 681.
 
 
 68
 I find a serious problem with the special condition imposed in this case. By requiring that Lewis resign from a local public office to which he has been duly elected, the district court is infringing on an area that is properly within the domain of the state or municipality. It is the responsibility of the state or municipality to determine the qualifications necessary for a person to be elected to and remain in local office. Similarly, it is the responsibility of the state or the municipality to determine whether a convicted person should be forced to resign from such an elected position. In my view, the district court overstepped the bounds of its authority and abused its discretion by imposing the special condition of probation on Lewis. Therefore, I dissent from the majority's affirmance of the district court's sentence.